Good morning, my name is Aluerto and I represent Mr. Eduardo Sosa. Your Honor, in this case, the officers intended a reasonable suspicion to stop the vehicle in question that Mr. Sosa was driving. Starting with one of the factors that they mentioned, they referred to the fact that it was shift-change. As you can see in the briefs, they don't define what the shift-change time is. They indicate the shift-change is the time when more, I guess maybe more aliens are coming or more offenses occur. One of the officers indicates that he considers the shift-change to be from 3.30 to 4.30 as Agent Dorsey, and when that's engaged, 84 of the experts are frightened. So that's a one-hour gap. Did you say it's occurring at like 4 o'clock? Is that in that gap? Yes, it is. But they're using the fact that this time is greater than that. Agent Dorsey, the agent from Google on the other hand, speaks also of shift-change. When he says to begin at 12 o'clock, it ends at either 6 or 7. So he expands the time that they consider shift-change. One of the reasons that I think they don't carry it or burden this, they say shift-change is when these things happen and that this greater timeframe falls within the shift-change time. But depending on who you ask, that's either a three-hour window per day, or in this case, a 15-hour window per day, according to Agent Redugo's testimony. But didn't the spread words say, didn't they say that they also found out the purpose of the fact that they were considering a really solid decision? They did, Johanna. But I don't think that any organization, from what I remember of Arvizio, there was no argument as to what shift-change was, what the timeframe was. And they tried to get shift-change, a shift-change time in this case. And the answers they received during the record are anywhere from a three-hour timeframe during one day, or a 15-hour time period depending on, according to Agent Redugo. Do you think that's a resonation? The positions. Excuse me? How did you get these answers? This is the answer that was expressed. Here it is with the positions. The positions. Yes, the agents, yes. So there's something that happens afterwards. There's no question about what shift-change is. Correct. Who filled out the declaration on this point? I'm sorry. The decision is shift-change. Who made the initial statement about shift-change? I believe Agent Dorsey testified first. He was the first one to mention it at the deposition. Agent Redugo also mentioned it. I inquired as to what they meant when they said shift-change, and these are the answers I received. I also believe that at the end of the transcript, they asked if they had any statistics, but they didn't. So I started to figure out what they meant by shift-change, and they have these varying answers, and I think that's the reason that the courts didn't take it into account. It doesn't ever be so. They don't come out with a court that has to look at all the factors, put them together, and weigh it. I just think the weight is less than when they've used this term shift-change. Frank, you don't know what he said. This was presented to the district court. The district court made the decision on it. Why don't we defer to the district court on that? I mean, there is a sort of conflict, and you get conflicts among the witnesses all the time. This is why we have to sit here just to sort these things out. And this actually happened right in the sweet spot of both agents who testified, right? Shift-change was like the majority of the time. That's right. But I think the court should give it some weight, and I think the district court just gave it too much weight. I don't think we're arguing as to whether it was taken into account. We'll just argue over the weight it should be given. Another item, and this is important, I think the court needs to look at this closely, too. One of the things the officers testified gave them a reason to stop was that the driver in this case was driving below the speed limit, and he indicated that people do that to try to avoid being, I guess, you know, the words they use was being more discreet around law enforcement. And this was Agent Dorsey again. Yeah, a lot of these facts stick behind you both ways. They speak, they look slow, they look at us, and they look at us. You know, it's not going to be always sticking behind you both ways. But, I mean, what we have here is right now, we had a call from an officer, an off-duty officer, who saw something that looked like someone switched out of an alley, looking for him on a cell phone, and then they get picked up. So they're in this awful corner of the alley. And so they get a call. And this isn't just officers seeing people driving by. They actually have a tip from somebody who's pretty liable because he himself is a law enforcement officer. It's just a meaningless call. Why isn't that enough right now? Well, yeah, there's a couple of things. And one of the points that I think the courts need to take into account is they don't deny that the off-duty border patrol officer is someone who is more liable. But what I believe is what he saw is something that, had they offered it to individuals there while on the phone, it didn't have been a smear leak. It would have been a different story. And the courts have said that you can't look at that, especially in a city like Arizona, where, according to the New York Times, and this is 17 years ago, so the number is higher, over a million people in the state are of Hispanic descent. It's probably close to 2 million now. And so you can't take that information and use that for your resource suspicion. I have a rubric here. I already know that he wouldn't have thought that. Was there a specific question asked to him about that? Because, I mean, he did mention that they were Hispanic, but he also was looking at these people on the cell phone or they were looking around under car cuffs. I mean, it does seem like suspicious activity. Maybe he would have thought it was suspicious if they weren't Hispanic. You know, I don't know. From my memory, there was no question asked about that. So how can we assume, as the appellate court, that this was sort of race-based, that the whole thing was race-based? Well, I wouldn't say it's all race-based, but I would say that based on the fact that that is the first thing he mentions in the call, the first thing he mentions in the deposition, that it was something that was a basis for him to make the call and additionally a basis for the other officers to make the stop. And if I can get back just briefly to the point I was making about the more disputed or less disputed, the reason I wanted to bring that up is if you look at it, the vehicle that stopped them was marked. That is, Mr. Sosa didn't know that there was a police vehicle behind him. And so I think for the officers to say, well, he's driving slow and that gave you a reason to stop him because of strange vehicles. One thing is that Mr. Sosa is not supposed not to know that there are unmarked police vehicles around him. I think we all live in fear of those things on the highway, you know, because in the car, as you hear, you immediately think, oh, my God, but maybe he's unmarked somewhere. I think we all feel the same. And I'm going basically to what we're getting, what the officers are saying, because they say certain things such as you try to be more discreet. And besides the driving 5 to 10 miles per hour below the speed limit, what they fail to mention, even though I talk about this, is that this car was actually a car that was not discreet at all. Not what? Not discreet at all. It's an all-90s Cavalier. We would consider it gold, except for the fact that it's black. It's got a black hood and blacker sides. He can spend up to $2 on a car that stands out, not something that's discreet. And so they don't mention it because it doesn't help their position, but it did, of course, take into account, if you're looking at all these items, that, in fact, there are some things that show that this individual was not trying to put in an engraving of the sort in a reservatory or whatever. Thank you. Thank you. This is one on balkan. So it's one of the U.S. Attorney's Office in Tucson, here in the United States. The defendant's argument is premised on the type of argument that Supreme Court said was improper in the arrest piece of the case, and that is he tried to take each individual item and come up with an excuse for it or an explanation for it. Supreme Court emphasized that in my view, you've got to look at the totality of the circumstances and then use that in this case. This certainly was reasonable suspicion. Stop the vehicle. For example, the defendant talked about the shift change. Regardless, the testimony was clear that it's a fresh hearing. You didn't see a shift change. It was actually at 4 o'clock. This occurred at 3.30. So we're going to argue how the agency decides what shift change conditions are. This is kind of right in the heart of the difference of shift change, and they explain why things happen to shift change, why crimes act during shift change, because that's when the officers are basically going to have you switching positions instead of speaking. So that certainly supported it. Slower than the speaking, that's another factor he wanted to argue. He did emphasize that it's an unmarked car. I would say that it actually works in the government's favor. I think most people, after reaction, they see a marked law enforcement vehicle, they slow down. You wouldn't have that same situation with an unmarked vehicle. So, again, that's a factor. It's not even a major factor. It's basically a factor you can use in every case, though. He says they're going too fast. He'll say they're going too fast. If they're going too slow, they're going too slow. It's almost impossible to avoid that being a factor. He says they're going right on the speed limit. I'm just saying they're safe. They're safe. I think it depends on the circumstances. Like I said, I think the people see a marked police vehicle. I think the tendency is, especially if they're exceeding the speed limit at that point, to slow down to the speed limit. I'm not sure you would have that same reaction. He certainly had an observation in Tucson, Arizona, that people slow down below the speed limit otherwise. I mean, I think your argument is you're driving slowly so that no one pulls you over for speeding. But if they were speeding, you could probably say they were racing away. So, I mean, testing like speed is a difficult one. I think, again, in the context of it's an unmarked vehicle, they're driving below the speed limit so they don't get pulled over. Don't give the police officer a traffic stop reason to pull them over. And considering the fact that the AGs in this case were in an unmarked vehicle, I think there's a factor, certainly, that the court could consider. I know the totality of the search is certainly only a factor by far. I mean, you've got the agent who was going home from school, going on to the alley, again, 25 blocks from the border, in an area that the other agent specified was a high-swelling area, basically. Floating up in an alley that is not used by vehicles to cross for it, other than utility type trucks. So, and all of that. But there's nothing on the record about why they were driving slower. No, there isn't. And it could have been road conditions. I mean, this was a not-well-traveled road, right? I believe this is a rainy alley. And I don't, again, I think the court, at least from what you've put, it's emphasized that you can't, in the, you have to look at the totality of the search. He says you can't, you know, take apart each individual factor. You've got to look at it in the totality, kind of like you're going to levy something on them. But, you know, you can't do that. That's a narrower and narrower circumstance. So, at the bottom, you have what the other agent, vehicles that would meet that description. So, we're justifying stopping the vehicles that meet that description. There is a reasonable suspicion to disarm the investigation. And you certainly have that here. They were also using a route that avoids a checkpoint. That was a key factor to the agents. So, if you look at all of the factors, there was certainly reasonable suspicion to disarm this vehicle. Unless the court has any questions. Thank you. Thank you. Thank you. I was just wondering, you know, you're probably taking a stop at a state from Haiti. If you ever look at a map of southern Arizona, a state from Haiti basically brings us together to rural towns or rural areas. They're not cities. I mean, they are cities, but they're relatively small cities. One side is the Accompispe area, and that's more or less where the stop occurred. The other town, it's the other side of Rue B, and that stretches Douglas. So, it is a well-traveled road. I know there's questions about the checkpoint. It is a heavily traveled road because it's basically a way in and out of Douglas, as opposed to going to Douglas. So, for that reason, I think the fact that he was driving east instead of west, I don't think it adds a lot to it. As Judge Bennett mentioned, Judge Bennett said that this wasn't well-traveled. It is relatively well-traveled because it is the main connection point between these two cities. That's the end of my time. Thank you. I guess it's well-traveled if you want to avoid the traffic. Or if you want to go to Douglas. That's all you have to say. Thank you very much. Thank you. Thank you.
judges: Kozinski, Friedland, Bennett